**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
(EASTERN DIVISION)**

| | |
|---|---|
| **KELLY LEINERT,** *in her individual capacity, and as representative and next friend for her minor children, G.L. and J.L,* ) ) ) ) | |
| **Plaintiffs.** ) ) | |
| **v.** ) ) | **Case No. 14-cv-1719** |
| **SAINT LOUIS COUNTY, MISSOURI; SAINT LOUIS COUNTY POLICE DEPARTMENT; SAINT LOUIS COUNTY BOARD OF POLICE COMMISSIONERS; CHIEF JON BELMAR,** *in his individual and official capacity as Chief of Police of the Saint Louis County Police Department*; **SERGEANT ADAM KAVANAUGH,** *in his individual and official capacity as Supervisor of the Tactical Operations Unit*; **DETECTIVE AMY MEYER,** *in her official and individual capacity*; **SAINT LOUIS COUNTY TACTICAL OPERATIONS UNIT MEMBERS, JOHN AND JANE DOES 1-18,** *in their official and individual capacities;* **SAINT LOUIS COUNTY POLICE OFFICERS, DETECTIVES AND OTHER PERSONNEL, JOHN AND JANE DOES 1-10,** *in their official and individual capacities,* ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendants.** ) | |

<u>**COMPLAINT**</u>

Kelly Leinert ("Kelly"), by and through her attorney, Daniel F. Harvath, acting on her personal behalf, and as representative and next friend for her minor children, G.L. and J.L. (the "children")(collectively, the "Family"), files this Complaint seeking redress for the St. Louis County Police Departments' and related parties' multiple and gross violations of the Family's Constitutional rights.  In support, Kelly states as follows.

## OVERVIEW

1.      On July 31, 2014, the children, J.L. and G.L., 12 and 14, respectively, were home alone at the Family's residence in Webster Groves, Missouri; Kelly had left the residence for a brief period of time in order to attend a "Zumba" class. Relaxing in the assumed safety and privacy of their home and bedrooms, the children were ignorant of the nightmare they were about to experience.

2.      At approximately 7:00 p.m., Defendants arrived outside the children's home to "serve and execute" a search warrant ("Search Warrant")[1] at the residence that ostensibly sought potential evidence of the commission of a non-violent crime, reportedly occurring almost eight months prior to the raid, at the residence. From the outset, St. Louis County used a level of force that was excessive, and way out of proportion to the threat by using at least _fifteen_ St. Louis County Police officers for the operation, and at least _twelve_ "SWAT Team" officers wearing combat-level body armor, combat boots, camouflage, and Kevlar helmets with visors, and armed with military-grade weaponry and equipment, including military-grade assault rifles.

3.      While "serving and executing" the related Search Warrant, Defendants' unlawful conduct included, but was not limited to, the pointing of their loaded assault rifles at the heads and chests of both children, clearly unarmed, and man-handling, J.L., a 4"11', 80lb child.

4.      The Defendants' unconstitutional conduct stemmed from improper policies, customs and practices of Saint Louis County and its Police Department.  Defendants' treatment of the Family already has caused them, _inter alia_, severe and potentially permanent psychological harm, including precursor symptoms of Post-Traumatic Stress Disorder.

---

[1] Plaintiffs maintain and preserve their right to argue that the search warrant is invalid.

5.      Seeking redress, Plaintiffs bring this civil rights lawsuit against Defendants under the Fourth and Fifth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Missouri common law.

## THE PARTIES

6.      Plaintiff Kelly Leinert ("Kelly") is a single mother who has two masters degrees and works full-time as a consultant; she is 52 years old, approximately 4"11' tall, weighs about 120 lbs, and has no criminal record.

7.      In this action, Kelly is representing herself, as well as her children, G.L. and J.L., as their parent and as their next friend. She resides in this judicial district.

8.      Plaintiff G.L., one of Kelly's son, is a shy but friendly and intelligent 14-year-old; G.L. is approximately 5"8' tall and weighs roughly 120 pounds.

9.      Plaintiff J.L., Kelly's youngest son, is an outgoing and athletic 13-year-old, 12-years-old at the time of the circumstances described herein; he is approximately 4"11' and weighs about 80 lbs.

10.     Defendant Saint Louis County (the "County") is a political subdivision located in the State of Missouri.

11.     The County provides governmental services to those within its boundaries including, but not limited to, police protection and investigative services provided through the St. Louis County's Police Department.

12.     Defendant Saint Louis County Police Department (sometimes, the "Department") is a St. Louis County agency serving the County residents.

13.     Defendant Saint Louis County Board of Police Commissioners (the "Board"), pursuant to the County Charter, is to control and oversee the St. Louis County Police Department. The Board is located in, and convenes within this judicial district.

14.     Defendant Police Chief Jon Belmar was the Chief of Police for the St. Louis County Police Department at all relevant times, acting within the scope and course of his employment with, and as agent of, the Department and the County. Belmar is a citizen of Missouri, residing in this judicial district.

15.     In connection with the Department's personnel and policy decisions, Chief Belmar acted, and continues to act, as one of the Department's final policymakers, along with the Board and the County.

16.     Defendant Sergeant Adam Kavanaugh, at all relevant times, was a coordinator and supervisor of the St. Louis County SWAT Team, acting in the scope and course of his employment with, and as an agent of, the Department and the County. Kavanaugh is a citizen of Missouri, residing in this judicial district.

17.     Defendant Detective Amy Meyer, at all relevant times, acted as the lead detective presiding over the investigation underlying the search and seizure occurring at the residence. At all relevant times, Meyer acted in the scope and course of her employment with, and as agent of, the Department and the County. Meyer is a citizen of Missouri, residing in this judicial district.

18.     Defendants SWAT Team Members, John and Jane Does 1-18, played active, firsthand roles in the Constitutional violations occurring at the residence. The currently-unknown identities of these individuals will be determined through discovery.

19.     Defendants Officers, Detectives and other Department Personnel John and Jane Does 1-10 likewise played first-hand, active roles in the Constitutional violations occurring at the

residence.   The currently-unknown identities of these individuals will be determined through discovery.

20.     At all times alleged herein, each individual Defendant was acting under color of state law.

## JURISDICTION AND VENUE

21.     This Court has original, federal question jurisdiction over Plaintiffs' "Section 1983" claims pursuant to 28 U.S.C. §§ 1331 and 1337, as well as 42 U.S.C. §§ 1983, 1988 and 2000e-5.

22.     The Court has supplemental jurisdiction over Plaintiffs' Missouri common law claims pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiffs' claims occurred in this district.   In addition, all Plaintiffs and all the known Defendants reside in this judicial district.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A.  Defendants' Failure to Adequately Investigate the Premises Prior To The Raid

24.     The Search Warrant is a largely boilerplate document allowing a search of the residence at the specific *address* given thereon, with nothing more specific.

25.     No suspects or other individuals are named on the Warrant.

26.     The Warrant does not mention any individual who was, or is suspected of committing the alleged crime being investigated as being present at the residence.

27.     According to the Department's "Incident Report," the alleged commission of the illegal conduct occurred on January 10, 2014. *See* Exhibit 2 ("Incident Report")(redacted in part).

28.     January 10, 2014, is approximately eight months prior to the day of the raid, July 31, 2014.

29.     The Warrant and Incident Report both fail to mention who was, or may have been inside the residence at the time the officers decided to raid the residence.

30.     The SWAT Team publicly claims that it "continually updates and maintains the latest in tactical equipment, technology and training, enabling it to successfully complete any mission in the **safest manner possible**…" Exhibit 1 (emphasis added); *also available on-line at:* www.stlouisco.com/LawandPublicSafety/PoliceDepartment/Services/SpecializedServices

31.     Despite such a statement, the Department failed to undertake any reasonable attempt to surveil the property, or otherwise determine who occupied the residence, prior to carrying out such a violent raid thereof.

32.     A mere thirty minutes of surveillance prior to the raid would have revealed that the only adult living at the household, Kelly, had left just prior to the initiation of the raid.

33.     Defendants, whether deliberately or negligently, failed to take such basic investigatory steps and/or ignored such investigation results, forcefully and violently raiding the house when only children were present.

34.     According to Defendant Meyer, speaking to Kelly after Kelly had arrived at her residence shortly after the raid had ended, the Department did not know who lived in, or was present at the house before conducting the raid.

35.     As further indicated by Meyer, the Warrant allowing a search and seizure at the residence was based primarily (if not wholly), upon electronic evidence obtained from online records – particularly the fact that the IP address assigned to the residence by a private Internet

Service Provider ("ISP") was somehow "linked," nearly eight months prior to the raid, to illegal digital content.

### B.  Defendants' Policies and Practices

36.     According to Defendants' online website, the St. Louis County SWAT Team, self-proclaimed as "one of the finest tactical units in the Nation," is "the region's only fully dedicated [SWAT Team] … [including] [e]ighteen police officers, two sergeants and a captain maintain[ing] 24-hour readiness to meet the tactical or special needs of [the] Department…; The [SWAT Team] is capable of dealing with hostage situations, armed and barricaded subjects [and] suicidal persons…" Exhibit 1.

37.     The St. Louis County Police SWAT Team, without any stated exceptions, "executes *all* search warrants issued in Saint Louis County." *Id.* (emphasis added).

38.     An unconstitutional, military-style invasion of every residence subject to any search warrant – with no exceptions — appears routine pursuant to the County and Department's practices, policies, and customs, both written and unwritten.

39.     As occurred here, the SWAT Team frequently carries out its mission of "serving and executing" search warrants by conducting military-style, violent, dynamic entries into civilian residences regardless of:

> a.  the type of the suspected underlying crime (here, non-violent, allegedly illegal, computer usage occurring eight months prior);
>
> b.  the actual level of any attendant threat (two unarmed children, home by themselves); or

    c.   the thoroughness and accuracy of the underlying investigation (the underlying investigation in this case had produced eight-month stale IP "linkage" to allegedly illegal digital material).

### C. Defendants Mass Their Forces in Preparation for the Raid

40.    In preparation for executing the Warrant on the Leinert residence, at or around 6:30 or 6:45 p.m. on the day of the raid, County Officers, predominantly SWAT Team officers, gathered in a parking lot next to a sports field within the Webster Groves Recreation Complex.

41.    There were at least twelve SWAT Team members present, and a total of at least fifteen officers altogether.

42.    Every SWAT Team member was in full military garb: very heavy body armor, heavy combat boots and gloves, camouflage fatigues, and Kevlar helmets with visors; carrying military-grade assault rifles, semi-automatic pistols strapped to their hips, and other weaponry (hereinafter, "militarized").

43.    The militarized officers gathered between and in front of approximately 8 to 12 police vehicles, at least eight of which were unmarked, full-sized S.U.V.s.

44.    Also present was a large, extended, predominantly black armored van that the SWAT Team used in order to transport its officers to and from the Leinert residence.

45.    Upon observing these militarized officers gathered in the parking lot, witnesses first were alarmed at the intimidating and imposing presence of what looked like a platoon of military soldiers, fully equipped for urban combat.

46.    That initial alarm, however, was tempered by the fact that the SWAT Team officers appeared to be gathered for purposes of conducting a drill or training exercise.

47.     The officers did not appear particularly focused or stressed, but instead were smiling, joking, and even laughing out loud at times while chatting with each other as they milled about.

48.     The overall demeanor of the officers did not appear consistent with preparation to enter a potentially life-threatening situation.

49.     After a period of time, at approximately 7:00 p.m., the officers huddled in a group and then piled into the SWAT Team's armored transport van.

50.     The van then left the lot, along with two to three other unmarked police vehicles.

51.     The van and other vehicles headed towards the Leinert residence, just a few minutes away.

### D.  Defendants' Storming and Ransacking of the Leinert Residence

52.     At or around 7:05 p.m., the SWAT Team van parked several houses down from the Leinert residence.

53.     One plain-clothed officer, believed to be Sergeant Kavanaugh, approached the residence as if trying to ascertain who was inside.

54.     The same officer then returned to the SWAT Team van, meeting with at least 12 SWAT Team members.

55.     The SWAT Team members subsequently marched up the street in formation from the van to the Leinert residence.

56.     As the SWAT Team members marched up the street, the noise they made disturbed and attracted the attention of many neighbors, some of whom opened their doors to determine what was happening.

57.     Upon seeing any neighbor, the marching SWAT Team officers shouted to them that they were to "stay (or go) inside," as if the entire block was unsafe.

58.     The SWAT Team, upon arriving at the Leinert residence, surrounded the residence.

59.     Multiple SWAT Team officers moved to the front door of the house, while at the same time other SWAT Team officers moved to the rear of the house.

60.     The SWAT Team then employed a no-knock, "dynamic" entry, in which officers kicked in the front door (which was unlocked) and at least 6 to 8 SWAT Team members simultaneously flooded the approximately 800-square-foot residence.

61.     Plaintiff J.L., in his bedroom playing a video game, had a headphone earbud in one ear, but otherwise clearly could hear the door being kicked open, followed by yelling from officers *already in the house*.

62.     At no time prior to Defendants' entry did J.L. (or any other on-scene witness) hear the officers knock, buzz the doorbell, or otherwise announce their presence before forcefully entering the house.

63.     Each member of the SWAT Team entering the house was fully militarized, and each had their military-grade assault rifles raised and ready to fire.

64.     J.L., startled by the commotion in the front room of the house, turned in his chair and stood up to walk out of his room to observe what had happened.

65.     Before J.L. had even exited his room, the 4"11', 80 lb. child was confronted at close range by three fully-militarized SWAT Team members, at least one of whom trained his assault rifle on J.L.'s chest and head area while screaming orders at him to raise his hands (which were empty) and to move to the couch in the front room.

66.     Frightened and traumatized, J.L. hesitated, at which point one of the SWAT Team officers forcefully grabbed J.L. and pulled him towards the living room couch.

67.     Once seated on the living room couch, J.L. curled his body into a ball and began sobbing, with armed officers preventing him from leaving the couch while the other officers continued moving throughout the residence.

68.     From the couch, J.L. was able to observe at least eight officers, the majority SWAT Team members, in or near the vicinity of the living room.

69.     Despite the fact that J.L., a small child, was visibly shaken and crying, neither the SWAT Team members, nor any other officer offered him any comfort or assurances of any sort.

70.     Very shortly after J.L. was confronted by the SWAT Team, 14-year-old G.L., who had been asleep in his room, also was confronted by three different SWAT Team members.

71.     G.L. had been asleep in his room when the officers came rushing into the house.

72.     Awakened by the noise and commotion, and having heard an officer inside the house yell "police," G.L. exited his room and walked into the kitchen, preemptively raising his hands to make it abundantly clear that he was unarmed.

73.     Just as he was walking into the kitchen, G.L. was confronted by three fully-militarized SWAT Team members.

74.     G.L. had his hands raised and obviously was unarmed and otherwise no threat.

75.     Despite this, at least one of the SWAT Team members confronting G.L. raised and trained his automatic rifle on the unarmed 14-year-old's head and chest, screaming at him to keep his hands up and ordering him to go sit in the living room.

76. G.L. complied, keeping his hands up while at least one officer's assault rifle remained trained on him from behind, and moved into the living room, sitting down near (but still separated from) his younger brother, J.L.

77. Once G.L. had sat down, without reading the boys their Miranda rights, the other non-SWAT Team officers interrogated both G.L. and J.L. regarding the presence of any illegal material in the residence.

78. Although not handcuffed, neither boy felt as though they could exit the residence due to the intimidating presence created by the several, heavily-armed officers in the room and in front of any exit points.

79. Similar to the way that J.L. was treated, even after it was abundantly clear that G.L. posed no threat to the officers, was clearly upset, and largely despondent, the officers' highly-aggressive, combative demeanors towards the children did not subside; they offered him no comfort whatsoever.

80. While the boys were restrained and being questioned, the other officers essentially ransacked the house, tearing clothes out of drawers, pulling sheets off of beds, and going through almost every single item of clothing in Kelly's closet, before tossing each to the floor.

81. Upon leaving the residence, one of the SWAT Team members, referring to the mess the officers had left behind following their "search" of the residence, told the terrified and traumatized boys that they "had better get the mess cleaned up before [their] mother g[ot] home."

**E.  The SWAT Teams' Inconspicuous Exit From The Residence**

82. After the raid, in stark contrast to the SWAT Team's attention-grabbing approach and violent raid of the residence, the SWAT Team members, one at a time, inconspicuously headed back towards the SWAT Team van.

83.     The SWAT Team members that gathered outside of the van displayed the same carefree demeanors that they had shown prior to the raid.

84.     The SWAT Team members resumed laughing and joking with each other, as if what they had just done was routine and no big deal.

85.     Consistent with their relatively inconspicuous method of exit, the group of SWAT Team members already outside of the van piled into the van; and the van drove up the street to the Leinert residence, backing up into the driveway.

86.     At that time, another group of SWAT Team officers quickly exited the house and piled into the van.

87.     The van then drove off and away from the scene.

88.     At the time the SWAT Team left the residence, witnesses estimated that it was approximately 7:30 p.m.

89.     7:30 p.m. is the approximate time at which the "Incident Report," seemingly inaccurately, claims officers *first* arrived at the scene. Exhibit 1.

90.     By the time Kelly arrived home shortly after 8:00 p.m., there was no sign at all that the SWAT Team had been there, and no officer made any mention to Kelly of the same.

### F.  The Continuation of the Leinert Family's Ordeal

91.     Between around 7:30 p.m. and 8:10 p.m., the boys continued to be detained on living room chairs, having been moved from the couch to separate chairs on the far wall of the living room.

92.     Several officers continued searching the house.

93.     Some of those officers monitored the children, remaining in the living room.

94.     Present in the living room was an officer with thick body armor standing guard over the children and an officer with a photographer's camera sitting at a table.

95.     The photographer had used, and later continued to use, his photography equipment in order to take numerous photographs of all portions of the house.

96.     Also present in the living room was Detective Meyer.

97.     While in the living room, J.L. observed an officer sit down at J.L.'s computer, place a USB drive next to the computers' USB port, and begin typing into the computer.

98.     After several minutes, the officer closed the computer.

99.     The officer then turned and tossed the computer into a cardboard box along with other electronic devices confiscated from the residence.

100.    No items were bagged or marked, and it appeared that no steps were taken to preserve the content or integrity of any of the confiscated electronic items.

101.    At approximately 7:55 p.m., Kelly, who had finished her "Zoomba" class and a conversation with a friend, first saw her phone (which she had left in her purse in the trunk of her car), and realized that she had missed multiple calls.

102.    Kelly got into her car and headed as quickly as possible to her residence.

103.    While on the way, as Kelly was trying to call her son, J.L., she received an incoming call from J.L.'s phone.

104.    Detective Meyer, not J.L., was on the other end, having taken the phone from J.L., apparently as evidence, but then using it to call Kelly.

105.    Detective Meyer allowed J.L. to speak into the phone briefly, who told his mother that he "was scared to death" and asked her "to please come home," to which Kelly responded, "What is going on?"

106.    Before J.L could answer, Detective Meyer took the phone back and suggested that Kelly head home; Kelly responded that she was on the way, hung up the phone, and arrived at the residence just a few minutes later.

107.    When Kelly arrived, the SWAT Team and their vehicles already had left the scene, leaving little sign that they had been in the residence just a few minutes before.

108.    Kelly entered the living room of her residence and observed at least three officers in that room, and could hear multiple officers moving in other locations of the residence.

109.    She also saw J.L., in tears and obviously petrified, and G.L., in complete shock.

110.    Kelly, who had been ordered not to join her children, stood between the officers and her children, asking why the officers were in her house and why her children were so traumatized.

111.    Detective Meyer explained to Kelly that the Department did not know who lived at the residence, as they had entered the residence solely based upon electronic evidence.

112.    Sergeant Adam Kavanaugh, overhearing Detective Meyer speaking with Kelly, quickly moved between Kelly and Detective Meyer and turned directly to Kelly.

113.    Kavanaugh's demeanor was aggressive.

114.    Kavanaugh pointed his finger directly into Kelly's face, and yelled at her, from approximately two feet away, to "shut up," demanding that she sit down immediately or be handcuffed, arrested, and taken to jail.

115.    The other officer that had been in the dining room took out his handcuffs and began walking towards Kelly as if to arrest her.

116.    At that time, J.L., the unfortunate witness to the inappropriate threats and abuse of his mother, pled with the officer to not handcuff his mother.

117.   Kelly, now more terrified than angry, submitted to Kavanaugh's threats and sat down, against her will, away from her children.

118.   Eventually, after several minutes, Kelly was allowed to hold and comfort J.L. on her lap while she waited in fear and confusion for the officers to leave her residence.

119.   The officers, without reading Kelly her Miranda rights, then questioned Kelly as to whether her residence contained any illegal material.

120.   After speaking to Kelly a bit further, the officers finally left the premises, by that point, later in the evening, approximately 9:15 p.m or later.

121.   Before leaving, the officers confiscated Kelly's work-issued computer, J.L.'s tablet and computer, G.L.'s computer and i-phone, along with certain unidentified "discs," according to a scribbled note on the warrant receipt that the St. Louis County Police Department officers left on the dining room table of the residence.

### G.  The Tragic Aftermath of Defendants' Improper Conduct

122.   The City, the Board, and the St. Louis County Police Department have policies, patterns, and customs of using heavily-armed, militarized SWAT Team officers to "search and execute *every* search warrant" – which frequently involves storming into and raiding the homes of private citizens, threatening and intimidating the inhabitants, and ransacking their personal property — regardless of the type of crime being investigated or the non-violent, non-threatening nature of the individuals at a given residence.

123.   Such policy inevitably will have, as it has had here, severe consequences.

124.   All three Plaintiffs were in stable psychological condition prior to Defendants' raiding of their residence, and prior to the excessive, life-threatening treatment of J.L. and G.L.

125.    Now, each of the Family members suffers, and continues to suffer psychologically every single day from what Defendants did to them.

126.    Since the July 31, 2014, incident, Kelly has had to take both of her children to therapists on a multiple-times-a-week basis to aid them in dealing with what Defendants had done to them.

127.    All three members of the Family now are suffering from, *inter alia,* symptoms of Acute Stress Disorder and/or Post-Traumatic Stress Disorder ("PTSD").

128.    PTSD carries with it multiple symptoms that the children already have shown and struggled with, including panic-attacks, despondence, depression, anxiety, profound changes in sleeping and eating habits, and major loss of enjoyment of life.

129.    The psychological impact of such a traumatic experience for each child, by itself, will profoundly impact G.L. and J.L.'s personalities and worldviews, and have long-term, damaging affects on their behavior, relationships, and mental states.

130.    Each of the Plaintiffs has had their Constitutional and civil rights trampled upon by Defendants and have been damaged by such actions.  Pursuant to the above allegations, Kelly, individually and on behalf of her children, asserts the following Counts against Defendants.


## COUNT I
**(Violation of the Fourth and Fifth Amendments of the Constitution;
Deprivation of Civil Rights, 42 U.S.C. § 1983)
(Against All Defendants)**

131.    Plaintiffs incorporate each preceding paragraph as if set forth herein.

132.    Defendants, all acting under color of law, with deliberate indifference to, and reckless disregard for the safety and well-being of Kelly or her children, deprived each Plaintiff

of their civil rights under the Fourth and Fifth Amendments to the United States Constitution, as protected under 42 U.S.C. § 1983.

133.    Specifically, Defendants violated at least the following of Plaintiffs' Constitutional Rights:

    a.   The right to be free from excessive force and unreasonable searches and seizures;

    b.   The right to due process; and

    c.   The right against self-incrimination.

134.    Defendants' excessive use of force in each instance delineated below and described in further detail throughout this Complaint, was unnecessary and objectively unreasonable under the circumstances.

135.    Defendants' use of excessive force includes, but is not limited to:

    a.   Using at least *twelve* SWAT Team officers, most of them fully-militarized, and approximately *fifteen* officers in total, in order to "serve and execute" a search warrant seeking evidence of the commission of a non-violent crime reportedly occurring eight months previously, at a house containing no identifiable threats;

    b.   The SWAT Team members' pointing and training their assault rifles on J.L.'s head and chest when the child clearly was unarmed and posed no safety threat;

    c.   The SWAT Team members' pointing and training their assault rifles on G.L.'s head, chest and back when the child clearly was unarmed and posed no safety threat;

    d.   One of the SWAT Team members forcefully grabbing and pulling the 4'11", 80lb, J.L. to the living room couch; and

e.  Sergeant Kavanaugh's screaming and pointing his finger into Kelly's face, and threatening to have her arrested and taken to jail for no legitimate reason.

136.  Defendants' violations of Plaintiffs' rights to due process and to be free from unreasonable searches and seizures also include at least the following improper acts:

a.  Several officers' detaining the children and Kelly from leaving a roughly nine-square-foot area of the living room of the residence for an overly-lengthy period of time;

b.  One or more officers' interrogating both children and Kelly about matters relevant to the investigation, and doing so without reading any of the Family members their *Miranda* rights;

c.  Failing to take reasonably adequate steps to determine who was, or may have been present at the house just before or during the time of the raid; and

d.  The St. Louis County Police Department's having the policy, custom, and practice of using the SWAT Team to serve *every* search warrant generated in St. Louis County *without any exceptions*, and without gauging and then using an appropriate level of force based upon the nature of the crime being investigated and/or any individuals who may be within the residence.

137.  As a direct and proximate result of Defendants' deprivation of, and infringement upon Plaintiffs' Constitutional civil rights, all three Plaintiffs have suffered physical and monetary damages, including severe and potentially permanent psychological trauma.

<u>**COUNT II**</u>
**(Failure to Competently Hire, Train, Supervise**
**and/or Discipline - 42 U.S.C. § 1983)**
**(Against the County, the Board, the Department, and Jon Belmar)**

138.  Plaintiffs incorporate each preceding paragraph as if set forth herein.

139.    The named on-scene officers, as well as all of the Jon and Jane Doe officers and SWAT Team members directly responsible for the excessive force and deprivation of, and infringement upon, the Family's Constitutional rights, were at all times acting under the direction and control, and pursuant to the policies, practices and customs of the County, the Board, and the Department, implemented and supervised by Defendant Jon Belmar, Saint Louis County Chief of Police, and one of the final policymakers for the Department ("Supervising Defendants").

140.    The Supervising Defendants all were final policymakers for the St. Louis County Police Department.

141.    The Supervising Defendants acted negligently, carelessly, recklessly and with deliberate indifference to the safety of Plaintiffs and others by failing to properly train, supervise, control, direct, monitor and/or discipline the named officers and detectives, as well as the John and Jane Doe police officers and SWAT Team members.

142.    The Supervising Defendants failed to, *inter alia,* adequately supervise and train its officers with respect to: the proper investigation and execution of search warrants; the proper use of force in conducting a search warrant upon residential households lacking safety threats; the proper and safe use of military-grade weaponry and equipment; and the proper methods of securing and retaining potential evidence.

143.    As a direct and proximate result of the Supervising Defendants' failures delineated herein, all three Plaintiffs have suffered physical and monetary damages, and all three Plaintiffs have suffered severe and potentially permanent psychological trauma.

## COUNT III
### (*Monell* Claim for Having Policies
### That Encourage Excessive Use of Force and Unreasonable
### Search and Seizure Practices in Violation of the Fourth Amendment – 42 U.S.C. § 1983)
### (Against the County, the Board, the Department, and Jon Belmar)

144.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein.

145.     The Supervising Defendants were, at all times relevant to this Complaint, responsible for the policies, practices and/or customs of the Department.

146.     The Supervising Defendants all were final policymakers for the St. Louis County Police Department.

147.     The misconduct described above by the individual Defendants was undertaken pursuant to polices, practices and/or customs of the County, the Board, and the Department, and Belmar, which included, but were by no means limited to:

    a.  Assigning the SWAT Team to execute *every* search warrant in the County, without any limitation, regardless of the nature of the crime being investigated or any attendant risk, thereby promoting the excessive use of force and entry similar to that used at the Leinert residence when, for instance such level of force is used when entering and searching a residence occupied at the time only by children (the "Blind Search Policy"); and

    b.  Accepting and/or purchasing military-grade weaponry, equipment and vehicles, and putting the same to use without first requiring that the using officers undergo training commensurate to that required of U.S. Military soldiers before they are allowed to use the same weaponry and equipment during combat situations (the "Premature Militarization Policy").

148.    The above-described widespread practices, which were expressed and otherwise so well-settled as to constitute *de facto* policy in the Department, were allowed to exist and perpetuate because the Supervising Defendants, having authority over such actions, exhibited deliberate indifference to the likelihood that damages and injuries to innocent people inevitably would result from such broad and reckless policies, especially in combination.

149.    That deliberate indifference has led to St. Louis County Police officers frequently shocking the community with excessive, unnecessary displays of military force; the pointing and training of military-grade weaponry at unarmed, non-violent individuals, including children; and affirmatively *creating* dangerous and tense situations out of situations that otherwise would not be.

150.    The misconduct and Constitutional violations committed by the individual Defendants during the course of the related investigation and the execution of the warrant on the Leinert residence were carried out pursuant to these improper policies, customs, and/or patterns and practices described above and herein.

151.    As a direct and proximate result of the Supervising Defendants' policies, customs, and/or patterns and practices, all three Plaintiffs have suffered physical and monetary damages, and all three Plaintiffs have suffered from severe and permanent psychological trauma.


## COUNT IV
**(Intentional Infliction of Emotional Distress Under Missouri State Law)**
**(Against Meyer, Kavanaugh and John or Jane Doe Officers and/or SWAT Team Members)**

152.    Plaintiffs incorporate each preceding paragraph as if set forth herein.

153.    The previously described actions by the Defendants are malicious, wanton, and outrageous to an extent that would torment and cause emotional distress to any reasonable person in the Plaintiffs' respective positions.

154.    The infliction of emotion distress as a result of Defendants' conduct easily was foreseeable.

155.    Defendants knowingly and intentionally inflicted emotional distress upon members of the Leinert Family by their excessive and improper actions during and after the raiding and the ransacking of the residence.

156.    The officers did cause Kelly and her children severe emotional distress.

157.    Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and should be regarded as atrocious, and utterly intolerable in a civilized community.

158.    As a direct and proximate result of Defendants' joint and several actions delineated herein, all three Plaintiffs have suffered physical and monetary damages, and all three Plaintiffs have suffered from the severe and permanent psychological trauma caused by Defendants' conduct.


## COUNT V
**(Negligent Infliction of Emotional Distress Under Missouri State Law)**
**(Against Meyer, Kavanaugh and John or Jane Doe Officers and/or SWAT Team Members)**

159.    Plaintiffs hereby incorporate each of their allegations set forth in this Complaint as if fully set forth herein.

160.    Defendants, acting separately and in concert, individually and in their official capacities, realized or should have realized that their conduct involved an unreasonable risk of causing distress to the Plaintiffs.

161.    As a direct and proximate result of Defendants' actions delineated herein, all three Plaintiffs have suffered physical and monetary damages, and all three Plaintiffs have suffered from severe and permanent psychological trauma.

## COUNT VI
### (Assault and Battery Under Missouri State Law)
### (Against Kavanaugh and Certain Other Officers And SWAT Team Member)

162.    Plaintiffs incorporate all preceding paragraphs as if stated herein.

163.    J.L. was assaulted when the SWAT Team officers screamed at him and trained their assault rifles on his head and chest.

164.    G.L. also was assaulted when the SWAT Team officers screamed at him and trained their assault rifles on his head, chest and back.

165.    In pointing their assault rifles at J.L. and G.L., the officers intended to put the children in apprehension of serious bodily harm, despite the children being unarmed and posing no threat.

166.    The children were put in such a state of apprehension and fear.

167.    J.L. also was battered when an officer forcefully, unjustifiably, and intentionally grabbed J.L.'s arm and pulled him towards the couch inside the living room of the residence, after the officers had trained their assault rifles on J.L.

168.    In threatening to unlawfully arrest and take to jail Kelly for asking questions about her children put her in severe apprehensions, not only of bodily, but of other types of harm.

169.    Kavanaugh and the other officers' engaging in these baseless and illegal threats to cause Kelly to be in apprehension of imminent physical harm and/or captivity and thus control her actions; and those officers succeeded in terrorizing and traumatizing Kelly into submission with their behavior.

170.    As a direct and proximate result of Defendants' actions delineated herein, all three Plaintiffs have physical and monetary damages, and all three Plaintiffs have suffered from severe and potentially permanent psychological trauma.

**WHEREFORE**, all three Plaintiffs pray for judgment in the following manner:

a.  Compensatory damages caused by Defendants' excessive use of force and other illegal practices committed against the Family, including compensation for the potentially permanent psychological damage done to Kelly and to her children;

b.  Punitive damages in an amount necessary and appropriate to punish Defendants for their actions and, just as important, to deter every other similarly-situated city, county, village or municipal police department and its officers from engaging in like behavior;

c.  A determination and declaration by this Court that the County and Department's policy of assigning the service and execution of *all* search warrants to the SWAT Team, notwithstanding any other factors unique to each warrant, is unconstitutionally excessive as applied to non-violent suspected perpetrators of non-violent crimes;

d.  A determination and declaration by this Court that St. Louis County's Premature Militarization Policy is unconstitutional in that giving officers the use of military-grade weaponry without military-level training and/or without strict guideline for

when and how military equipment is used, is inherently dangerous and excessive

to all involved; and

e.   Such other and further relief as the Court deems just.


Dated: October 8, 2014                         Respectfully submitted,

                                               **DANIEL F. HARVATH, ESQ.**


                                               By: /s/ *Daniel F. Harvath*
                                               Daniel F. Harvath, #57599MO
                                               Goldenberg Heller Antognoli & Rowland, P.C.
                                               2227 South State Route 157
                                               Edwardsville, IL 62025
                                               (direct) 618-650-7148
                                               (cell) 314-550-3717
                                               daniel@ghalaw.com
                                               *Attorney for Plaintiffs*